IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------X

In re:                                            Chapter 11

KB TOYS, INC.                                     Case No.: 08-13269 (KJC)
a Delaware corporation, et al.,

                          Debtors.                Jointly Administered

**Hearing Date: 12/1/09 @ 1:00 p.m.**
**Objection Deadline: 11/24/09 @ 4:00 p.m.**

-------------------------------------------------------------X

**JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, PURSUANT TO SECTIONS 105(a), 305(a), 349 AND
1112(b) OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE, FOR ENTRY OF AN ORDER (A) APPROVING A
STIPULATION BETWEEN THE DEBTORS, THE COMMITTEE AND THE
PRENTICE ENTITIES, (B) APPROVING PROCEDURES FOR (I) THE
DISTRIBUTION OF CERTAIN FUNDS TO HOLDERS OF ALLOWED
ADMINISTRATIVE CLAIMS AND (II) THE DISMISSAL OF THE DEBTORS'
CHAPTER 11 CASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

KB Toys, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned

chapter 11 cases (collectively, the "Debtors") and the Official Committee of Unsecured Creditors

(the "Committee") hereby submit this joint motion (this "Joint Motion") requesting the entry of

an order, pursuant to sections 105(a), 305(a), 349 and 1112(b) of the Bankruptcy Code and Rule

9019 of the Federal Rules of Bankruptcy Procedure, (a) approving a stipulation between the

Debtors, the Committee and the Prentice Entities (defined below) annexed hereto as **Exhibit A**

(the "Settlement" or the "Settlement Stipulation"), (b) approving procedures for (i) the

reconciliation, resolution and allowance of December 2008 Stub Rent Claims (defined below)

and 503(b)(9) Claims (defined below) and the making of distributions to holders of such allowed

claims and (ii) the dismissal of the Debtors' chapter 11 cases (collectively, the "Distribution and

Dismissal Procedures"), and (c) granting certain related relief. In support of this Joint Motion,

the Debtors and the Committee respectfully represent as follows:

# BACKGROUND

## A.    The Chapter 11 Filings

1.    On December 11, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and properties as debtors-in-possession.  No trustee or examiner has been appointed in these cases.

2.    On December 17, 2008, the Committee was appointed in these cases by the Office of the United States Trustee for the District of Delaware, consisting of the following seven members: (i) Li & Fung Toy Island Manufacturing; (ii) Mattel, Inc.; (iii) Hasbro, Inc.; (iv) Simon Property Group, Inc.; (v) GGP Limited Partnership; (vi) Big Lots, Inc.; and (vii) JJ Bean, Inc.

## B.    The Committee Resolution

3.    On the Petition Date, the Debtors filed, *inter alia*, that (i) *Emergency Motion for Interim and Final Orders (I) Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (B) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364 and (II) Scheduling a Final Hearing Thereon* (Doc. No. 15) (the "Cash Collateral Motion"), and (ii) *Emergency Motion of the Debtors for an Order: (I) Authorizing and Approving the Conduct of Going Out of Business, Store Closing or Similar Themed Sales, With Such Sales To Be Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing the Debtors to Assume the Consulting Agreement; (III) Authorizing Customary Bonuses to Store-Level Employees of Going Out of Business Locations; and (IV) Granting Related Relief* (Doc. No. 25) (the "GOB Sale Motion").  The GOB Sale Motion was scheduled to be heard the day after the Committee was appointed in these cases.

4.     On December 18, 2008, the Committee filed (i) an objection to the Cash Collateral Motion (Doc. No. 94) (the "Cash Collateral Objection") and (ii) an objection to the GOB Sale Motion and a cross-motion to convert the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code (Doc. No. 92) (the "GOB Sale Objection" and together with the Cash Collateral Objection, the "Committee Objections").

5.     Prior to the hearing held on December 18, 2008 to consider the GOB Sale Motion and the GOB Sale Objection, the Debtors, the Committee, the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders agreed to resolve the Committee Objections (the "Committee Resolution") on the terms and conditions announced on the record at the December 18, 2008 hearing and memorialized first in the Court's *Order (I) Authorizing and Approving the Conduct of Going Out of Business, Store Closing or Similar Themed Sales, With Such Sales To Be Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing the Debtors to Assume the Consulting Agreement; (III) Authorizing Customary Bonuses to Store-Level Employees of Going Out of Business Locations; and (IV) Granting Related Relief,* dated December 18, 2008 (Doc. No. 102) (the "GOB Sale Order"), and subsequently reaffirmed and clarified in the Court's *Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Modifying the Automatic Stay,* dated January 6, 2009 (Doc. No. 209), as subsequently amended by the *Amended and Restated Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Modifying the Automatic Stay,* dated January 28, 2009 (Doc. No. 334) (as amended and restated and as later modified by agreement of the Debtors and the Prepetition Second Lien Lenders, the "Final Cash Collateral Order").[1]  The following consideration was received by the Debtors' estates as a result of the Committee Resolution in addition to the budgeted items requested by the Debtors:

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Final Cash Collateral Order

(a)     payment in the form of an agreed surcharge pursuant to section 506(c) of the Bankruptcy Code was made for postpetition rent for the period of December 11, 2008 through December 31, 2008 ("December 2008 Stub Rent") to each landlord of a store location occupied by the Debtors for all or some portion of February 2009 who agreed to accept payment of prorated rent for February 2009 ("Pro-Rata Rent");

(b)     a reserve (the "503(b)(9) Reserve") was established and has been maintained by the Debtors for the ultimate purpose of making creditor distributions on account of actual, allowed claims of creditors pursuant to section 503(b)(9) of the Bankruptcy Code as determined by final order of the Court. Pursuant to the Final Cash Collateral Order, the 503(b)(9) Reserve was initially funded in the amount of $1,700,000 (the minimum agreed funding amount on account of cash savings resulting from the Debtors' payment of Pro-Rata Rent for February 2009) and later further funded in the approximate amount of $450,000 (the transferred balance of the terminated Senior Indemnity Account). As of the filing of this Joint Motion, approximately $2,150,000 is being held by the Debtors in the 503(b)(9) Reserve. An additional $50,000 is being held by the Prepetition First Lien Lender in the Senior Indemnity, which will be deposited into the 503(b)(9) Reserve in the near future;

(c)     the Committee received standing and authority to object to or challenge the Debtors' stipulations, including, but not limited to, those in relation to (i) the validity, extent, priority or perfection of the mortgage, security interests and liens of the Prepetition Second Lien Lenders, and (ii) the validity, allowability, priority, fully secured status or amount of the Prepetition Second Lien Obligations (collectively, the "Committee Claims"); and

(d)     the Committee was vested with the right, jointly with the Debtors, to make demand, prosecute, compromise, settle and/or otherwise deal with any Avoidance Actions, other than causes of action arising under section 549 of the Bankruptcy Code (as to which the Debtors retained exclusive rights, until the indefeasible payment in full in cash of the Prepetition First Lien Lenders).

## C.     Results of Committee Resolution

6.     Notwithstanding the unfortunate financial reality that the Debtors' assets were worth tens of millions of dollars less than the aggregate amount of all secured claims asserted against them, the Debtors and the Committee, together with the Prentice Entities, have worked diligently since the outset to achieve a meaningful and equitable return for creditors holding 503(b)(9) claims and administrative claims for December 2008 Stub Rent. A significant first step towards that goal was achieved early in these cases through the Committee Resolution, which, as discussed above, resulted in the creation and funding of the 503(b)(9) Reserve and

provided for the payment of December 2008 Stub Rent to those landlords (a) whose store locations were occupied by the Debtors in February 2009 and (b) who agreed to accept payment of Pro-Rata Rent for that month.

7.      In the very early days of these cases when the Committee Resolution was achieved, there was some level of uncertainty regarding how quickly the GOB Sales (defined below) would progress and how many of the Debtors' stores would remain open during February 2009, but it was anticipated by the Debtors, Committee and the Prentice Entities that a substantial percentage of the Debtors' stores would be occupied for some portion of February 2009. Accordingly, it was anticipated that a substantial amount of claims for payment of December 2008 Stub Rent would be satisfied as a result of landlords agreeing to prorate February 2009 rent in exchange for payment of December 2008 Stub Rent.

8.      However, the GOB Sales proceeded much more rapidly in many of the Debtors' stores than had been anticipated and, as a result, the Joint Venture (defined below) concluded the sales in a significantly greater number of stores prior to February 1, 2009 than was originally projected. Accordingly, a significantly smaller number of landlords than had been expected at the time the Committee Resolution was reached were able to, and did, participate in the Committee Resolution – and a significantly smaller amount of December 2008 Stub Rent was therefore paid – and the Debtors paid full February rent (rather than prorated February rent) for a greater number of store locations than had been anticipated.

9.      Accordingly, the Committee Resolution ultimately did not produce the level of equity in treatment among those creditors holding claims under section 503(b)(9) of the Bankruptcy Code and those holding claims for payment of December 2008 Stub Rent as had been desired and anticipated by the parties. Specifically, while only a small number of landlords were able to participate in the Committee Resolution and receive payment of December 2008

Stub Rent, approximately $2.2 million has been set aside and is currently being held by the Debtors in the 503(b)(9) Reserve.

**D.    Other Provisions of Final Cash Collateral Order**

10.    Pursuant to the Final Cash Collateral Order, the Debtors stipulated, among other things, subject to the Committee's right to challenge such stipulations, that the principal amount of revolving debt owed by the Debtors under the Prepetition Second Lien Facility as of the Petition Date was approximately $95,000,000 (together with any and all accrued and unpaid interest and other "Obligations" (as defined in the Prepetition Second Lien Credit Documents, the "Prepetition Second Lien Obligations") and the Prepetition Second Lien Obligations were secured by valid, perfected and enforceable liens and security interests (the "Prepetition Second Liens") in and on the Prepetition Collateral with priority over all liens and encumbrances on the Prepetition Collateral other than the Prepetition First Liens and the Permitted Prior Encumbrances.

11.    Pursuant to the Final Cash Collateral Order, the Debtors granted the Prepetition Second Lien Lenders adequate protection to the extent of any diminution in value of their interests in the Prepetition Collateral (including the Cash Collateral) in the form of (i) the Junior Adequate Protection Liens, (ii) the Junior Adequate Protection Superpriority Claim and (iii) the Junior Adequate Protection Payments.

12.    Pursuant to the Final Cash Collateral Order, all Junior Adequate Protection Payments to the Prepetition Second Lien Lenders are being held in escrow (the "WTC Escrow Account") by Wilmington Trust Company ("the "Escrow Agent") pursuant to that Escrow Agreement dated as of January 23, 2009, by and among the Debtors, the Committee, the Prepetition Second Lien Lenders, a joint venture comprised of Gordon Brothers Retail Partners, LLC and Great American Group, LLC, and Wilmington Trust Company (the "WTC Escrow Agreement"). As of the filing of this Joint Motion, approximately $15.3 million is being held in

the WTC Escrow Account pursuant to and in accordance with the terms of the Final Cash Collateral Order and the WTC Escrow Agreement

13.     Pursuant to the Final Cash Collateral Order, as part of the adequate protection provided to the Prepetition First Lien Lenders, the Debtors were authorized to pay to the Prepetition First Lien Lenders any Excess Cash Collateral to permanently reduce the Prepetition First Lien Obligations of the Debtors under the Prepetition First Lien Facility. In accordance with the Final Cash Collateral Order, the Prepetition First Lien Lenders received indefeasible payment in full of all Prepetition First Lien Obligations owed by the Debtors and were released from any and all Committee Claims (defined below).

14.     Pursuant to that Order of the Court dated March 9, 2009 (Doc. No. 484) and those stipulations dated June 4, 2009 (Doc. No. 693), August 7, 2009 (Doc. No. 778), September 15, 2009 (Doc. No. 813) and October 29, 2009 (Doc. No. 861) (collectively, the "Cash Collateral Extensions"), the Debtors and the Prepetition Second Lien Lenders agreed to extend the use of cash collateral through and including December 4, 2009 on the terms set forth in the Cash Collateral Extensions and accompanying Budgets.

15.     Pursuant to the Final Cash Collateral Order, the Prepetition Second Lien Agent has filed the following limited objections to the monthly applications for compensation and reimbursement of expenses of the Committee's retained professionals (collectively, the "Fee Objections"):

    (a).   To the fourth, fifth, sixth and seventh monthly applications of Cooley Godward Kronish LLP, lead counsel to the Committee, seeking a reduction of requested fees in the aggregate amount of $106,515.00;

    (b).   To the fifth monthly application of BDO Sediman LLP, financial advisor to the Committee, seeking a reduction of requested fees in the amount of $33,676.00; and

    (c).   To the seventh monthly application of Ashby & Geddes, P.A., co-counsel to the Committee, seeking a reduction of requested fees in the amount of $7,029.00.

## E.    Debtors' Asset Sales

16.     On December 18, 2008, the Court entered the GOB Sale Order. Pursuant to the GOB Sale Order, the Debtors were authorized to, *inter alia*, assume that Consulting Agreement dated December 11, 2008 between the Debtors and a joint venture comprised of Gordon Brothers Retail Partners, LLC and Great American Group, LLC (the "Joint Venture") governing the conduct of store closing sales at all of the Debtors' store locations (the "GOB Sales").

17.     On or before February 9, 2009, the Joint Venture concluded all store closing sales at the Debtors' stores, clearance centers and distribution centers, and the Debtors have closed all such locations. Thus, as of February 9, 2009, the Debtors no longer had any ongoing retail operations.

18.     On September 2, 2009, the Court entered that *Order (I) Approving Asset Purchase Agreement With CE Stores, LLC, (II) Authorizing the Debtors to Sell Assets Free and Clear of Liens, Claims and Encumbrances, and (III) Granting Other Related Relief* (Doc. No. 808), pursuant to which the Debtors received authorization to sell their interests in certain intellectual property in accordance with the terms of that Purchase Agreement, dated August 6, 2009, between KB Toys, Inc. and KB Holdings, LLC and CE Stores, LLC (the "IP Sale" and collectively with the GOB Sales and all other dispositions of the Debtors' assets consummated during these chapter 11 cases, the "Asset Sales"). In addition, throughout these cases, the Debtors have also collected various accounts receivable claims, tax refunds and monetized other miscellaneous assets of their estates.

## F.    Administrative Claims

19.     On March 24, 2009, the Court entered that *Order (I) Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof; and (II) Establishing Bar Date for Filing of Postpetition Administrative Expense Claims and Approving*

*the Form and Manner of Notice Thereof* (Doc. No. 528) (the "<u>Claims Bar Date Order</u>"). Pursuant to the Claims Bar Date Order, May 15, 2009 at 4:00 p.m. (Eastern time) was established as the deadline for all parties to assert, among others, (i) claims entitled to administrative priority under Section 503(b)(9) of the Bankruptcy Code and/or (ii) all other administrative expense claims (other than professional fee claims), including claims for payment of December 2008 Stub Rent, against the Debtors arising from and after the Petition Date through and including March 31, 2009 (the "<u>Administrative Claims Bar Date</u>").

20.    Since the passage of the Administrative Claims Bar Date, the Debtors have devoted significant time and resources to the reconciliation of outstanding administrative expense claims. Based upon the Debtors' review and analysis of the claims filed by the Administrative Claims Bar Date, the Debtors believe they have paid or otherwise settled and satisfied or will have satisfied prior to the hearing on this Joint Motion, all of the valid post-petition administrative claims against the estates that the Debtors were or are permitted to pay under the Final Cash Collateral Order. The Debtors thus believe that (other than certain professional fees and the *de minimis* cost of miscellaneous operating expenses that will be paid in the ordinary course of business under the Final Cash Collateral Order), the only outstanding valid claims entitled to administrative expense priority are certain claims for (i) payment of December 2008 Stub Rent asserted as administrative expense claims ("<u>December 2008 Stub Rent Claims</u>") and (ii) payment pursuant to section 503(b)(9) of the Bankruptcy Code ("<u>503(b)(9) Claims</u>"). The Committee's professionals have reviewed the Debtors' analysis of the timely filed administrative claims and concur with the Debtors' conclusions.

21.    Based on these reconciliation efforts, the Debtors estimate that there is approximately $4.5 million in outstanding valid administrative expense indebtedness chargeable to these estates (other than the professional fees and operating expenses discussed below), which amount is comprised of approximately (i) $2.7 million owed by the Debtors on account of

outstanding valid 503(b)(9) Claims and (ii) $1.8 million owed by the Debtors on account of outstanding valid December 2008 Stub Rent Claims.

**G.    Committee Action**

22.    On April 30, 2009, the Committee commenced an adversary proceeding against PKBT Lending LLC, PKBT Funding LLC and Prentice Capital Management, LP (collectively, the "Prentice Entities") and certain present and former officers and directors of the Debtors (the "D&O Entities") (Adv. Pro. No. 09-50944) (the "Committee Action") by filing a complaint seeking to, *inter alia*, recharacterize certain claims and recover certain transfers made prior to the Petition Date (the "Committee Complaint").  The claims asserted against the D&O Entities were subsequently withdrawn with prejudice by the Committee pursuant to the terms of an order of the Court dated June 25 2009 [Docket No. 729].

23.    On August 26, 2009, the Committee served the Committee Complaint and a summons and notice of pretrial conference upon the Prentice Entities.  The time for the Prentice Entities to respond to the Committee Complaint has been extended through and including December 22, 2009 by agreement of the parties.

**H.    Debtors' Current Capital Structure**

24.    The proceeds of the Asset Sales, together with all other estate funds collected by the Debtors, are insufficient to satisfy all of the remaining Prepetition Second Lien Obligations. Specifically, the Prepetition Second Lien Lenders continue to hold an unsatisfied claim of approximately $95 million plus accrued but unpaid interest, fees, and expenses under the Prepetition Second Lien Facility.  In addition, creditor participants of the Prepetition Trade Program assert a collective claim against the Debtors secured by third priority liens on substantially all of the Debtors' assets in the approximate amount of $2,048,872, which claim (to the extent allowed) is a purely unsecured claim, given the substantial undersecured position of the Prepetition Second Lien Lenders.

25. The Debtors' remaining assets consist of the Avoidance Actions, the Committee Action and certain receivables and miscellaneous assets with a value substantially less than the outstanding secured claim of the Prepetition Second Lien Lenders. Pursuant to the Final Cash Collateral Order, the Prepetition Second Lien Lenders, however, were granted a lien on and a superiority claim to substantially all of the Debtors' assets, including the proceeds of Avoidance Actions (but excluding the Committee Action). The Debtors and the Committee thus both believe that any amounts recovered by the Debtors' estates on account of Avoidance Actions would be payable solely to the Prepetition Second Lien Lenders and not inure to the benefit of any other creditors of the Debtors' estates. The Debtors have no remaining significant assets that they or the Committee can monetize in a cost-effective manner for the benefit of the estates or the Debtors' other creditors. Accordingly, the Debtors do not have the financial ability to pay in full the outstanding administrative claims under section 503(b)(9) or those for December 2008 Stub Rent (or to make any payment to holders of priority or general unsecured claims) and therefore are unable to propose and confirm a plan of liquidation in these chapter 11 cases.

26. Moreover, the Committee has independently assessed the value of the continued pursuit and prosecution of the Committee Action, including the complexity and uncertainty of the claims asserted in the Committee Complaint, the likelihood and timing of a potential recovery and the costs that would be incurred in connection with the continued prosecution of the Committee Action in chapter 7, and has concluded that the consideration to be received by the Debtors' estates under the Settlement is fair and equitable and serves the best interests of the Debtors' estates and creditors.

## I. The Settlement

27. The Debtors, the Committee and the Prentice Entities have executed, subject to this Court's approval, the Settlement Stipulation which provides for, among other things: (i) $700,000 (which funds would otherwise be payable to the Prepetition Second Lien Lenders) to

be distributed to creditors holding Allowed December 2008 Stub Rent Claims (defined below), all in accordance with the proposed allocations and distribution procedures set forth herein and in the Approval Order; (ii) subject to and effective upon dismissal of the Debtors' chapter 11 cases, the release by the Prepetition Second Lien Lenders of all liens on and claims to the Avoidance Actions and/or the proceeds thereof; (iii) the release by the Committee of any and all Committee Claims against the Prentice Entities and the dismissal of the Committee Action with prejudice; and (iv) the agreement of the parties as to procedures governing the reconciliation, resolution and allowance of December 2008 Stub Rent Claims and 503(b)(9) Claims, the making of distribution to holders of such allowed administrative claims and the structured dismissal of these chapter 11 cases.

28.     The Debtors, the Committee, and the Prentice Entities believe that if their disputes are not resolved now, future proceedings would be protracted and expensive, involve complex issues of liability and/or damages, and involve substantial uncertainties and risks inherent in litigation that could take years to resolve.  The parties thus have considered the benefit to the Debtors' estates and creditors that will be received as a result of the Settlement, particularly in light of the costs, uncertainties, delay and risks of further litigation, and have concluded that the Settlement is fair and equitable and in the best interests of the Debtors, their estates, their creditors, and all other parties-in-interest.

## JURISDICTION AND VENUE

29.     The Court has jurisdiction to consider this Joint Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**RELIEF REQUESTED**

A.   S<span style="font-variant:small-caps">ETTLEMENT</span> A<span style="font-variant:small-caps">PPROVAL</span>

   30.   By this Joint Motion, the Debtors and the Committee seek entry of an order, substantially in the form of order annexed hereto as **Exhibit B** (the "Approval Order") approving the terms of the Settlement Stipulation pursuant to Bankruptcy Rule 9019(a) and section 105(a) of the Bankruptcy Code. The salient terms of the Settlement Stipulation are as follows:[2]

   a.   **Consideration to Debtors' Estates.** On the Effective Date[3], the Debtors' estates shall receive the following consideration:

   (i).   $700,000 of the cash proceeds of the Asset Sales, which funds would otherwise be payable solely to the Prepetition Second Lien Lenders, shall be transferred from the WTC Escrow Account and held in escrow by the Debtors for the dedicated purpose of making distributions to the holders of actual, allowed, but as yet unpaid, claims for payment of December 2008 Stub Rent (the "December 2008 Stub Rent Reserve"). All distributions from the December 2008 Stub Rent Reserve shall be subject, in all respects, to the terms, conditions and procedures set forth in the Approval Order.

   (ii).   The Prepetition Second Lien Agent, on behalf of and at the direction of the Prepetition Second Lien Lenders, shall waive, release and forever discharge any deficiency claim and any adequate protection claim of the Prepetition Second Lien Lenders against the Debtors' estates solely with respect to, and solely to the extent of, the cash/consideration to be retained by the Debtors' estates pursuant to Sections 1 and 3 of the Settlement Stipulation.

   b.   **Consideration to the Prentice Entities.** On the Effective Date, the Prentice Entities shall receive the following consideration (which shall be paid to the Prepetition Second Lien Agent for the benefit of the Prepetition Second Lien Lenders):

   (i).   All cash of the Debtors' that from time to time comes into the possession of the Debtors' estates (whether from proceeds of the Asset Sales, pending causes of action, release of cash collateral supporting letters of credit or otherwise) other than (i) cash held in the 503(b)(9) Reserve and (ii) cash used or to be used by the Debtors pursuant to and in accordance with Sections 1, 3 and 7 of the Settlement Stipulation.

---

2    To the extent any summaries and/or descriptions of the Settlement contained in this Joint Motion differ in any way from the terms of the Settlement Stipulation, the terms of the Settlement Stipulation shall govern.

3    Defined in the Settlement Stipulation as the date the Court enters the Approval Order granting the Joint Motion and approving the Settlement Stipulation.

(ii).    All cash then held in the WTC Escrow Account in excess of the amounts to be distributed to the Debtors in accordance with Sections 1, 3 and 7 of the Settlement Stipulation. Pursuant to the terms of the WTC Escrow Agreement, the Debtors and the Committee seek authorization to cause the Escrow Agent to disburse the funds held in the WTC Escrow Account in a manner consistent with the terms of the Settlement Stipulation.

(iii).    Except as specifically set forth in the Settlement Stipulation, under no circumstances shall the Prepetition Second Lien Lenders or any Prentice Entity be liable for any funding of, or the making of any payments related to, obligations of the Debtors' estates, including, without limitation, payment of any claims of any creditors of the Debtors, none of which shall be chargeable to, or be the responsibility of, the Prepetition Second Lien Lenders or any Prentice Entity. For the sake of clarity, and subject to the terms of the final sentence of Section 7 of the Settlement Stipulation, the Prepetition Second Lien Lenders shall be entitled to receive 100% of the proceeds held or received by the Debtors other than proceeds constituting consideration to be distributed to the Debtors' estates as set forth in Sections 1, 3, and 7 of the Settlement Stipulation. Under no circumstances shall any amounts paid to the Prepetition Second Lien Lenders or any Prentice Entity to date or in the future be subject to disgorgement or return to the Debtors or their estates or otherwise.

(iv).    From and after the Effective Date, the Prepetition Second Lien Lenders may request and the Debtors shall execute such documents as are reasonably required to transfer title to uncollected accounts receivable and other non-monetary assets of the estates to the Prepetition Second Lien Lenders.

    **c.**    **Extension of Use of Cash Collateral and Budget Modification.**  On the Effective Date:

(i).    Clause (b) of the first sentence of paragraph 3 of the Final Cash Collateral Order, as previously modified by the Cash Collateral Extensions, shall be further amended such that the date "December 4, 2009" is replaced with the date January 31, 2010

(ii).    The Budget attached to the Final Cash Collateral Order as Exhibit A shall be replaced with the Budget attached to the Settlement Stipulation as Exhibit A, which has been agreed upon by the Debtors, the Committee and the Prepetition Second Lien Lenders, and shall be deemed to be the "Budget" within the meaning of the Final Cash Collateral Order.

(iii).    Except as specifically amended by the terms of the Settlement Stipulation, the Final Cash Collateral Order shall remain in full force and effect in accordance with its terms.

**d.** **Release of Committee Claims and Allowance of Secured Claim**. On the Effective Date:

  (i).    The Committee shall (i) waive, release and forever discharge any and all Committee Claims against the Prentice Entities, the Prepetition Collateral, and the validity or amount of the Allowed Prepetition Second Lien Lenders' Claim (defined below) and (ii) cause the Committee Action to be dismissed with prejudice. The time for the Prentice Entities to respond to the Committee Complaint shall be tolled pending the Effective Date and, in the event the Effective Date does not occur, until the date that is twenty (20) days following the date of entry of an order denying this Joint Motion.

  (ii).   The claim of the Prepetition Second Lien Agent on behalf of the Prepetition Second Lien Lenders shall be allowed in the amount of $105,566,516, (the "Allowed Prepetition Second Lien Lenders' Claim")

  (iii).  The Prepetition Second Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and not subject to recharacterization, subordination or otherwise avoidable. The Allowed Prepetition Second Lien Lenders' Claim shall be deemed allowed as a secured claim within the meaning of section 506 of the Bankruptcy Code. The stipulations contained in Section 4(c) of the Settlement Stipulation shall be binding on all creditors, interest holders and parties in interest in the Debtors' chapter 11 cases.

**e.** **Withdrawal of Fee Objections and Payment of Committee Professionals**. On the Effective Date, (i) the Prepetition Second Lien Agent, on behalf of the Prepetition Second Lien Lenders, shall cause the Fee Objections to be withdrawn and shall not contest the requests of the Committee's professionals for allowance and payment of the subject fees, and (ii) $150,000 of the cash proceeds of the Asset Sales, which funds would otherwise be payable solely to the Prepetition Second Lien Lenders, shall be transferred from the WTC Escrow Account and held in escrow by the Debtors and paid to the Committee's professionals, upon allowance by the Court, in respect of those fees subject to the Fee Objections (the "Committee Professional Reserve").

**f.** **Avoidance Actions**. Subject to and effective upon the dismissal of the Debtors' chapter 11 cases, the Prepetition Second Lien Lenders shall be deemed to have waived any lien upon or other right or claim to any Avoidance Actions or the proceeds thereof.

**g.** **503(b)(9) and Stub Rent Claims Allowance Process**. Within fifteen (15) days after the Effective Date (or such later date as may be agreed to in writing by the parties hereto), the Debtors shall, in accordance with the procedures set forth in the Approval Order, provide notice to those parties that timely filed (or who are otherwise deemed by order of the Court to have timely filed) claims asserting administrative expense priority on account of December 2008 Stub Rent or under Section 503(b)(9) of the Debtors' proposed allowed amounts of such claims to share in the 503(b)(9) Reserve and the December 2008 Stub Rent Reserve. Any disputes regarding the allowed amounts proposed by the Debtors shall be resolved in accordance with the procedures set forth in Section C below and in the Approval Order.

**h.**     **Funding of Professional Fee Escrows**. Immediately prior to submission of an order dismissing the Debtors' chapter 11 cases as provided for in the Approval Order, the Debtors shall, consistent with the Final Cash Collateral Order and Budget (as amended) and the Carveout, fund to each of the professionals retained by the Debtors and the Committee an amount equal to their respective estimated unpaid professional fees and expenses through the proposed date of dismissal (collectively, the "Professional Fees Escrows"), which funds shall be held in escrow by such professionals until payment of their fees and expenses is permitted by the terms of the Approval Order or other order of the Court. Any funds remaining in any of the Professional Fees Escrows after payment of all allowed fees of such professional shall be promptly remitted to the Prepetition Second Lien Lenders.

**i.**     **Dismissal of Bankruptcy Cases**. Promptly after distribution of the funds in the 503(b)(9) Reserve and the December 2008 Stub Rent Reserve, funding of the Professional Fees Escrows, and payment of any then accrued and unpaid fees to the Office of the United States Trustee, the Debtors' chapter 11 cases shall be dismissed upon the filing of the requisite certification of counsel for the Debtors, as provided for in the Approval Order.

**B.**     **PROPOSED TREATMENT OF ALLOWED 503(b)(9) AND STUB RENT CLAIMS**

31.     As noted above, the Committee Resolution, while providing an important first step toward achieving the joint goal of the Debtors and the Committee to produce a meaningful and equitable distribution to holders of allowed December 2008 Stub Rent Claims and 503(b)(9) Claims, ultimately produced an uneven -- and entirely unintended -- result among creditors holding these claims. Specifically, while only a small percentage of landlords received payment of December 2008 Stub Rent under the Committee Resolution, approximately $2.2 million is presently being held by the Debtors in the 503(b)(9) Reserve.

32.     Based on the Debtors' books and records and their review of the filed claims, it is presently estimated that a total of approximately $2.7 million in filed 503(b)(9) Claims and a total of approximately $1.8 million in filed December 2008 Stub Rent Claims will be allowed at the conclusion of the Claims Resolution Process (defined below). The Settlement, if approved by the Court, would provide for the funding of the December 2008 Stub Rent Reserve in the amount of only $700,000. Accordingly, unless a portion of the funds currently held in the 503(b)(9) Reserve are made available to pay Allowed December 2008 Stub Rent Claims (defined below), it is estimated that holders of Allowed 503(b)(9) Claims (defined below) would receive a

distribution of as much as 81% of the allowed amount of their claims, while holders of Allowed December 2008 Stub Rent Claims would receive a distribution of no more than 39% of the allowed amount of their claims.

33. The Debtors and the Committee believe that the foregoing distribution scenario requires equitable modification. In fact, given that the only alternative to the Settlement is a chapter 7 conversion, the Debtors and the Committee believe that it is appropriate that holders of Allowed December 2008 Stub Rent Claims receive a *greater* cash distribution percentage than holders of Allowed 503(b)(9) Claims. The Committee and the Debtors believe that the Prepetition Second Lien Lenders' agreement to release their liens and claims on and to the proceeds of Avoidance Actions (notwithstanding the fact that a substantial portion of their secured claim will not be paid) upon the structured dismissal of these chapter 11 cases in lieu of conversion, represents a valuable piece of non-cash consideration provided to the Debtors' estates under the Settlement. Absent the Prepetition Second Lien Lenders' release of the Avoidance Actions and the parties' agreement to seek the structured dismissal of these cases, many of the Debtors' remaining trade creditors – including those holding 503(b)(9) Claims – would likely become targets of Avoidance Actions that to the extent successful would almost certainly benefit only the Prepetition Second Lien Lenders.

34. Accordingly, the Debtors and the Committee agree that the Prepetition Second Lien Lenders' release of any entitlement to the proceeds of Avoidance Actions upon the dismissal of these cases, as provided under the Settlement Stipulation, must be valued in fairness to the holders of Allowed December 2008 Stub Rent Claims, who, based on a review of the Debtors' transfers made during the 90-days prior to the commencement of these chapter 11 cases, have little or no Avoidance Action exposure compared to the potential exposure of holders of Allowed 503(b)(9) Claims.

35. Accordingly, the Committee (with the concurrence of the Debtors) respectfully requests that the Court authorize the Debtors to transfer $650,000 out of the 503(b)(9) Reserve and place those funds into the December 2008 Stub Rent Reserve. As a result, the Debtors would hold (i) approximately $1,550,000 in the 503(b)(9) Reserve to be distributed to holders of Allowed 503(b)(9) Claims (resulting in an estimated distribution of approximately 57% of the allowed amount of such claims, based upon the Debtors' current estimate of the allowed amount of 503(b)(9) Claims), and (ii) approximately $1,350,000 in the December 2008 Stub Rent Reserve to be distributed to holders of Allowed December 2008 Stub Rent Claims (resulting in an estimated distribution of approximately 75% of the allowed amount of such claims, based upon the Debtors' current estimate of the allowed amount of December 2008 Stub Rent Claims entitled to administrative priority).[4]

## C.    CLAIMS RESOLUTION PROCESS

36. The Debtors and Committee also seek approval of the following procedures governing the reconciliation, resolution and allowance of all 503(b)(9) Claims and December 2008 Stub Rent Claims filed against the Debtors' estates (the "Claims Resolution Process"). The proposed process, described below, will permit the distributions contemplated herein to holders of Allowed 503(b)(9) Claims and Allowed December 2008 Stub Rent Claims.

37. As noted above, May 15, 2009 was established as the bar date for the filing of all postpetition administrative expense claims against the Debtors incurred during the period from December 11, 2008 through and including March 31, 2009, including, without limitation, 503(b)(9) Claims and December 2008 Stub Rent Claims. Accordingly, the Debtors propose to commence the Claims Resolution Process by serving all persons and entities that have (i) filed 503(b)(9) Claims and administrative claims on account of December 2008 Stub Rent in

---

4 To the extent the total amount of Allowed 503(b)(9) Claims and/or Allowed December 208 Stub Rent Claims is greater than the amounts currently estimated by the Debtors, the percentage distribution made to the holders of such allowed claims from the 503(b)(9) Reserve and December 2008 Stub Rent Reserve, will be less than these estimated amounts.

accordance with the procedures set forth in the Claims Bar Date Order, or (ii) have 503(b)(9) Claims or administrative claims for December 2008 Stub Rent allowed pursuant to separate order of the Court (collectively, the "Potential Claimants") with a notice, substantially in the form annexed hereto as **Exhibit C** (the "Proposed Allowed Claim Notice") within fifteen (15) days after entry of the Approval Order. As set forth in the attached Exhibit C, the Proposed Allowed Claim Notice will, among other things:

- provide general case information, including the estimated amount of the anticipated distributions;

- include a separate schedule that will provide the Potential Claimant's claim information, including amount of the 503(b)(9) Claim or administrative claim for December 2008 Stub Rent as asserted by the Potential Claimant in its claim and the Debtors' proposed allowed amount of such Potential Claimant's 503(b)(9) Claim or December 2008 Stub Rent Claim to share in the pro rata distribution from the 503(b)(9) Reserve or December 2008 Stub Rent Reserve, respectively, together with a brief explanation for any variance from the amounts asserted by such Potential Claimant, and

- give instructions for filing an objection to the Debtors' proposed allowed amounts of the 503(b)(9) Claims and December 2008 Stub Rent Claims as set forth in the Proposed Allowed Claim Notice, including the date of the objection deadline and the mailing address where such objections must be sent; and

38.     Because the available funds are limited, these estates cannot afford an extensive claims reconciliation process. If a Potential Claimant or other interested party (a) disputes the proposed allowed amounts of the 503(b)(9) Claims or December 2008 Stub Rent Claims set forth in the Proposed Allowed Claim Notice or (b) wishes to assert a claim that is not reflected on any Proposed Allowed Claim Notice, such Potential Claimant or other interested party (the "Objecting Party") shall be encouraged to contact Debtors' counsel informally and attempt to resolve its claim or objection amicably, without the need to file a formal claim or objection, as provided in the following paragraph.

39.     If an Objecting Party wishes to file a formal claim or objection, the Objecting Party will be required to file its claim objection, together with documentation supporting its

claim or objection (each a "Claim Objection") with the Court on or before the deadline provided for in the Approval Order (the "Objection Deadline") and serve a copy of such Claim Objection on counsel for the Debtors and the Committee, so that it is received on or before the Objection Deadline. In any Claim Objection, the Objecting Party must state the grounds for its objection clearly and with particularity.

40.     Counsel for the Debtors will review all Claim Objections and supporting documentation timely submitted by an Objecting Party and consult with the Objecting Party in order to attempt to resolve any disputes regarding the Claim Objection. The Debtors and Committee seek authority for the Debtors (with the consent of the Committee) to resolve any objection to the Debtors' proposed allowed amounts of the 503(b)(9) Claims or December 2008 Stub Rent Claims set forth in any Proposed Allowed Claim Notice by agreement with such Potential Claimant without further order of the Court. If counsel for the Debtors and the Objecting Party cannot agree on a resolution, then counsel for the Debtors will request that the Court conduct a hearing on or before January 15, 2010 to resolve any Claim Objections, so that the Debtors are able to process and distribute the funds in the 503(b)(9) Reserve and December 2008 Stub Rent Reserve prior to January 31, 2010. Any claim allowed pursuant to the foregoing Claims Resolution Process will be deemed either an "Allowed 503(b)(9) Claim" or "Allowed December 2008 Stub Rent Claim." Additionally, the Debtors hereby seek a determination from the Court that any Potential Claimant or other interested party that does not timely file a Claim Objection be barred from challenging the proposed allowed amounts of the 503(b)(9) Claims and December 2008 Stub Rent Claims as set forth in any Proposed Allowed Claim Notice.

41.     In order to effectuate the foregoing proposed claim resolution process, the Debtors and Committee request that the Court waive, to the extent otherwise applicable, the requirements of Rule 3007 of the Federal Rules of Bankruptcy Procedure and Local Rule 3007-1 with regard to substantive claims objections and omnibus claims objections.

42.     The Debtors also request that the Approval Order provide that, from and after the date of its entry, none of the Debtors, nor the Committee, nor the Prentice Entities, nor any of the Debtors', Committee's or Prentice Entities respective present or former directors, officers, employees, shareholders, partners, members, affiliated funds, attorneys, consultants, advisors and agents (in each case, acting in such capacities), shall have or incur any liability to any person for any act taken or omitted to be taken in good faith in connection with or related to the negotiation, formation, preparation, dissemination, implementation, confirmation or consummation of the Settlement Stipulation or the Approval Order (other than an act in contravention of the Settlement Stipulation or the Approval Order), or any contract, instrument, release or agreement or document created or entered into, or any other act taken or omitted to be taken in good faith in connection with the Stipulation or the Approval Order.

**D.     DISTRIBUTION**

43.     Upon completion of the Claims Resolution Process, the Debtors propose to make the distributions to holders of Allowed 503(b)(9) Claims and Allowed December 2008 Stub Rent Claims from the funds held in the 503(b)(9) Reserve and December 2008 Stub Rent Reserve, respectively.  The Debtors and Committee propose making only a single distribution (which they anticipate making on or before January 31, 2010) and request that any distributed check(s) that have not been claimed and/or cashed within 90 days after distribution of the check(s) (the "Check Cashing Period") be deemed void and the distribution on account of such claims shall be deemed forfeited.  Furthermore, the Debtors request that any funds remaining in the 503(b)(9) Reserve or December 2008 Stub Rent Reserve after the expiration of the Check Cashing Period be remitted to the Prepetition Secured Lien Lenders.

**E.     ALLOWANCE PROCESS FOR FINAL PROFESSIONAL FEES**

44.     The Debtors and Committee also request that the Approval Order provide that, notwithstanding the dismissal of the Debtors' cases, the Court will retain jurisdiction to review

and approve the fees and expenses of the Debtors' and Committee's professionals, (which are to be paid from the Professional Fee Escrows to be funded pursuant to Paragraph 7 of the Settlement Stipulation). The Debtors and Committee propose that final fee applications be filed within 30 days after the entry of the Dismissal Order (defined below), and that the Court conduct a hearing to consider such fee applications within 60 days of the entry of the Dismissal Order.

**F.   CERTIFICATION OF COUNSEL AND REQUEST FOR DISMISSAL**

45.   Finally, after all funds have been distributed, the Professional Fee Escrows have been funded, and all accrued and as yet unpaid fees owing to the Office of the United States Trustee ("UST Fees") have been paid, the Debtors request that the Approval Order provide for the dismissal of the Debtors' chapter 11 cases upon the filing of a certification of counsel and request for entry of a dismissal order substantially in the forms annexed hereto as **Exhibit D** (the "Certification of Counsel and Request for Dismissal") and **Exhibit E** (the "Dismissal Order"). As set forth on the attached Exhibit D, the Certification of Counsel and Request for Dismissal, among other things, will (a) verify that all Claim Objections have been resolved, (b) identify the holders, claim amounts and distribution amounts for all Allowed 503(b)(9) Claims and Allowed December 2008 Stub Rent Claims,(c) confirm that the Professional Fee Escrows have been funded and (d) confirm that accrued UST Fees have been paid.

**APPLICABLE AUTHORITY**

**A.   APPROVAL OF SETTLEMENT**

46.   Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. Pro. 9019(a). The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006); see also In re Penn Central Transportation Co., 596 F.2d 1102 (3d Cir. 1979) ("administering reorganization proceedings in an economical and practical

manner it will often be wise to arrange the settlement of claims . . . ") (quoting In re Protective

Committee for Independent Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424

(1968)).

47.     In determining the fairness and equity of a compromise in bankruptcy, the United

States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy

court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the

probabilities of ultimate success should the claims be litigated, and estimate the complexity,

expense and likely duration of such litigation, and other factors relevant to a full and fair

assessment of the [claims]." In re Penn Central Transportation Co., 596 F.2d 1127, 1153 (3d Cir.

1979); see also In re Marvel Entertainment Group, Inc., 222 B.R. 243 (D. Del. 1998) (quoting In

re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997) (describing "the ultimate inquiry to be

whether 'the compromise is fair, reasonable, and in the interest of the estate.'")).

48.     The Third Circuit Court of Appeals has enumerated four factors that should be

considered in determining whether a settlement should be approved.  The factors are: "(1) the

probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity

of the litigation involved and the expense, inconvenience and delay necessarily attending it; and

(4) the paramount interest of creditors." Meyers v. Martin (In re Martin), 91 F.3d 389, 393 (3d

Cir. 1996); accord Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d

Cir. 2006).

49.     The decision to approve a settlement "is within the sound discretion of the

bankruptcy court." In re World Health Alternatives, Inc., 344 B.R. at 296; see also In re

Neshaminy Office Building Assoc's, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in

Meyers v. Martin (In re Martin), 91 F.3d 389.  The bankruptcy court should not substitute its

judgment for that of the parties.  See In re Neshaminy Office Building Assoc's., 62 B.R. at 803.

The court is not to decide the numerous questions of law or fact raised by litigation, but rather

should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.  See In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert denied, 464 U.S. 22 (1983); see also In re World Health Alternatives, Inc., 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

50.     Since the inception of these chapter 11 cases, the Debtors, Committee and Prentice Entities have been negotiating and litigating over the rights and obligations of the Debtors and their estates vis-à-vis the posture of these chapter 11 cases and the liens and claims of the Prepetition Second Lien Lenders.  Following lengthy and often contentious negotiations that took place before and after the commencement of the Committee Action and the voluntary judicial mediation held with respect thereto, the parties ultimately agreed on a resolution of the outstanding issues among them as embodied in the Settlement Stipulation and this Joint Motion. The settlement of these issues is the only way to avoid an unfortunate conversion of these chapter 11 cases to chapter 7, in which creditors would (a) not be guaranteed a distribution equal to or greater than those provided for under the Settlement and (b) become the targets of Avoidance Action prosecution by a chapter 7 trustee, the proceeds of which the Debtors and Committee believe would be payable solely to the Prepetition Second Lien Lenders on account of the substantially unsatisfied Prepetition Second Lien Obligations.

51.     Additionally, authorizing the Debtors to effectuate the terms of the Settlement is well within the equitable powers of this Court.  See 11 U.S.C. § 105(a) ("The court may issue any order, process or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."); see also Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc.,

61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (nothing that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

52. Based on the following, each of the applicable <u>Martin</u> factors weighs heavily in favor of approving the Settlement pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code.

### i. **Probability of Success in Litigation**

53. The Settlement seeks to resolve the Committee Action and other disputes and controversies that arose between the parties during these chapter 11 cases. The Committee has independently assessed the value of the continued pursuit and prosecution of the Committee Action, including the complexity and uncertainty of the claims asserted in the Committee Complaint, the likelihood and timing of a potential recovery and the costs that would be incurred in connection with the continued prosecution of the Committee Action in chapter 7, and has concluded that the consideration to be received by the Debtors' estates under the Settlement is fair and equitable and serves the best interests of the Debtors' estates and creditors.

54. Due to the complexity and novelty of these disputed issues, along with the absence of any unencumbered estate funds that could be utilized to fund the continued prosecution of the Committee Action in chapter 11 or chapter 7, the outcome of litigation aimed to resolve these controversies is uncertain. Moreover, absent the Settlement, the Debtors' cases would be converted to chapter 7 and the remaining administrative expense creditors would never receive a distribution because the Prepetition Second Lien Lenders are owed substantially more than they will ultimately receive in these cases. The Settlement, however, provides not only for a substantial distribution to the Debtors' remaining administrative creditors, but also for an efficient resolution of these cases with a definite outcome, thereby avoiding the uncertainties,

and likely harsh realities, that would result in the event of a conversion. Accordingly, the Debtors and the Committee submit that resolution of these issues pursuant to the Settlement meets the first factor of the Martin test.

### ii. Complexity of Litigation Involved and the Expense, Inconvenience and Delay Necessarily Attending it

55. The Settlement satisfies the second Martin factor because a conversion of the Debtors' cases to chapter 7 would prejudice all creditors. Litigation by a chapter 7 trustee of the causes of action pled in the Committee Action and the prosecution of Avoidance Actions would significantly delay the conclusion of these cases, while failing to provide chapter 11 administrative creditors with the returns provided for in the Settlement. Accordingly, this factor weighs in favor of authorizing the Debtors and the Committee to enter into the Settlement.

### iii. Paramount Interest of Creditors

56. The Settlement serves the paramount interest of the Debtors' creditors by resolving the remaining issues and controversies among the Debtors, Committee and Prentice Entities. As discussed above, only through the Settlement will the Debtors be positioned to make substantial distributions to their remaining administrative creditors, while simultaneously providing them finality that could not be achieved for years in chapter 7. Accordingly, the Debtors and the Committee submit that the Settlement satisfies the third Martin factor.

### iv. Likely Difficulties in Collection

57. Finally, the fourth Martin factor is satisfied because the Prepetition Second Lien Lenders have asserted a lien on all of the Debtors' remaining assets, including cash collateral, and the Committee is precluded by the Final Cash Collateral Order from using the Prepetition Second Lien Lenders' collateral to prosecute the Committee Action. Accordingly, in order to continue the Committee Action, regardless of whether in chapter 11 or chapter 7, the Committee or a chapter 7 trustee would be required to retain contingency counsel to pursue the Committee

Action. Given the inherent complexity of the claims asserted in the Committee Action and the likely costs of contingency counsel, neither the Debtors nor the Committee believe that creditors would receive more value than provided for in the Settlement even assuming a successful recovery in that litigation. Accordingly, the Debtors and the Committee submit that the Settlement satisfies the fourth Martin factor.

### v. The Settlement Satisfies Bankruptcy Rule 9019

58.   The Debtors and the Committee respectfully submit that the Settlement is (i) fair and equitable; (ii) falls well within the range of reasonableness with respect to potential litigation outcomes; (iii) obviates the expense, delay, inconvenience and uncertainty that would attend the litigation of these disputed issues; and (iv) advances the paramount interests of creditors by adding value, as a matter of certainty, to the Debtors' estates while simultaneously providing a critical element of finality to creditors. Therefore, the Settlement satisfies Bankruptcy Rule 9019 and should be approved by the Court.

## B.   APPROVAL OF DISTRIBUTION AND DISMISSAL PROCEDURES

### i.   Dismissal of These Cases Is Warranted Under Section 1112(b) of the Bankruptcy Code

59.   The Court should approve the Distribution and Dismissal Procedures because the Debtors (a) lack the financial ability to pay administrative creditors in full and therefore cannot satisfy the chapter 11 plan requirements of the Bankruptcy Code and (b) have no remaining meaningful estate assets to administer.

60.   It is well settled that determinations concerning the payment of administrative expenses outside of a plan of reorganization are matters within the sound discretion of the bankruptcy court. In re HQ Global Holdings, Inc., 282 B.R. 169, 173 (Bankr. D. Del. 2002); see, e.g., In re Colortex Industries, Inc., 19 F.3d 1371, 1384 (11th Cir. 1994); In re Verco Industries, 20 B.R. 664, 665 (B.A.P. 9th Cir. 1982); In re Baptist Medical Center of New York, Inc., 52

B.R. 417, 421 (E.D.N.Y. 1985). One of the chief factors courts consider is making this determination is bankruptcy's goal of an orderly distribution among creditors and the need to prevent a race to the debtor's assets. In re HQ Global Holdings, Inc., 282 B.R. at 173. For the reasons stated herein, the Debtors and the Committee submit that authorization to make the proposed distributions outside of a plan of reorganization is justified and warranted under the circumstances of these cases.

61.     Under section 1112(b) of the Bankruptcy Code, a court may dismiss a debtor's chapter 11 case "for cause." 11 U.S.C. § 1112(b); In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984); In re Blunt, 236 B.R. 861, 864 (Bankr. M.D. Fla. 1999). Section 1112(b) of the Bankruptcy Code states, in pertinent part, "on request of any party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may . . . dismiss a case under this chapter . . . for cause . . . " A determination of cause is made by the court on a case-by-case basis. Albany Partners, 749 F.2d at 674. In addition, the decision to dismiss a case is particularly delegated to the bankruptcy court's sound discretion. See In re Camden Ordinance Mfg. Co. of Arkansas, Inc., 1999 WL 587790, at *2 (Bankr. E.D. Pa. 1999) (citing In re Atlas Supply Corp., 837 F.2d 1061, 1063 (5th Cir. 1988). Therefore, it is clear that the Court is authorized to dismiss the Debtors' chapter 11 cases upon a showing of "cause."

62.     The legislative history of section 1112(b) of the Bankruptcy Code and relevant case authority indicate that a court has wide discretion to use its equitable powers to dispose of a debtor's case. H.R. Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), reprinted in 1978 U.S.C.C.A.N. 57878; see also In re Preferred Door Co., 990 F.2d 547, 549 (10th Cir. 1993) (stating that a court has broad discretion to dismiss a bankruptcy case); In re Sullivan Cent. Plaza I, Ltd., 935 F.2d 723, 728 (5th Cir. 1991) (stating that a determination of whether cause exists under section 1112(b) of the Bankruptcy Code "rests in the sound discretion" of the bankruptcy court); In re Koerner, 800 F.2d 1358, 1367 & n.7 (5th

Cir. 1986) (stating that a bankruptcy court is afforded "wide discretion" under section 1112(b) of the Bankruptcy Code); Albany Partners, 749 F.2d at 674 (same).

63.     Section 1112(b) of the Bankruptcy Code provides a nonexclusive list of 16 grounds for dismissal.  11 U.S.C. § 1112(b)(4)(A)-(P); Frieouf v. U.S., 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that section 1112(b) of the Bankruptcy Code's list is nonexhaustive); In re Blunt, 236 B.R. at 864 (same).  One such ground is where a party-in-interest shows that there is an "inability to effectuate a plan [of reorganization]."5  11 U.S.C. § 1112(b)(2)(A); Preferred Door Co., 990 F.2d at 549; Sullivan Cent. Plaza I, 935 F.2d at 728.  Here, the Court may dismiss the Debtors' chapter 11 cases because the Debtors are unable to effectuate a plan.

64.     Inability to effectuate a plan arises when a debtor lacks the capacity to "formulate a plan or carry one out" or where the "core" for a workable plan of reorganization "does not exist."  See Preferred Door, 990 F.2d at 549 (quoting Hall v. Vance, 887 F.2d 1041, 1044 (10th Cir. 1989)) (finding an inability to effectuate a plan arises where debtor lacks capacity to formulate a plan or carry one out); In re Blunt, 236 B.R. at 865 (finding cause to dismiss debtor's case under section 1112(b)(2) of the Bankruptcy Code where "core" for a workable plan of reorganization found to be nonexistent).

65.     Here, it is simply not possible for the Debtors' to confirm a chapter 11 plan because the Debtors have liquidated all of their assets, have no unencumbered funds and cannot pay administrative expense claims in full.  All of the Debtors' inventory has been sold and the Debtors are no longer operating any retail stores.  As such, there is no business to reorganize and insufficient funds to confirm a plan of liquidation.  By continuing in bankruptcy, the Debtors would likely incur additional administrative expenses beyond their ability to pay. In sum, the Debtors have met their burden of proof to show that cause exists to dismiss the Debtors' chapter

---

5       In addition to the Debtors, the Committee is a party-in-interest in the Debtors' chapter 11 cases.  11 U.S.C. § 1109(b); In re Piper Aircraft Corp., 244 F.2d 1289, 1303 n.11 (11th Cir. 2001) (finding that a creditors' committee is a party in interest in a chapter 11 bankruptcy proceeding).

11 cases under section 1112(b) of the Bankruptcy Code due to their inability to effectuate a plan of reorganization.

66.     Once a court determines that cause exists to dismiss a chapter 11 case, the court must also evaluate whether dismissal is in the best interests of the estate and creditors.  See In re Superior Sliding & Window, Inc., 14 F.3d 240, 243 (4th Cir. 1994); In re Mazzocone, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995), aff'd 200 B.R. 568 (E.D. Pa. 1996); In re Warner, 83 B.R. 807, 809 (Bankr. M.D. Fla. 1988).  A variety of factors demonstrates that it is in the best interests of the Debtors' estates and creditors to dismiss these chapter 11 cases and authorize the Distribution and Dismissal Procedures sought herein.

67.     A dismissal of the Debtors' chapter 11 cases meets the best interests of creditors test where a debtor has nothing left to reorganize and the debtor's assets are fixed and liquidated. See In re BTS, Inc., 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); In re Camden Ordinance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 799 (E.D. Pa. 2000) (finding that a reorganization to salvage a business which ceased doing business was not feasible); In re Brogdon Inv. Co., 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (dismissing chapter 11 case in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).  As noted above, the Debtors have nothing left to reorganize, as virtually all of the Debtors' assets have been liquidated.  The only significant remaining task is for the parties to effectuate the Settlement and distribute the funds to the Debtors' remaining administrative creditors.

68.     Additionally, dismissal of these chapter 11 cases is warranted because the alternative – conversion to chapter 7 – would not serve the best interests of the Debtors' estates and creditors for the reasons discussed above.  One element of the best interests tests focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy.  In re Clark, 1995 WL 495951, at 5 (N.D. Ill. 1995); In re Staff Inv. Co., 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993).  The prime criterion for assessing the best interests of the estate is the

maximization of value as an economic enterprise. See id. Here, the Settlement and the proposed Distribution and Dismissal Procedures will maximize the value of the Debtors' estates because conversion to chapter 7 would impose substantial and unnecessary additional administrative costs upon the Debtors' estates with no guarantee that these estates and creditors would receive more consideration than provided under the Settlement.

69.    Numerous courts, both in this district and throughout the country, have approved structured dismissals under similar circumstances to the Debtors' where the debtor lacks the requisite financial ability to confirm a chapter 11 plan and/or the costs associated with plan confirmation would eliminate the possibility of a meaningful creditor recovery. See, e.g., In re CFM U.S. Corporation, et. al., Case No. 08-10668(KJC), Docket No. 1097 (Bankr. D. Del. 2009) In re Wickes Holdings, LLC, et al., Case No. 08-10212-KJC, Docket No. 1418 (Bankr. D. Del. 2009);  In re Bag Liquidation, Ltd, Case No. 08-32096, Docket No. 688 (Bankr. N.D. Tex. 2009); In re Levitz Home Furnishings, Inc., Case. No. 05-45189-brl, Docket No. 1167 (Bankr. S.D.N.Y. 2008); In re Princeton Ski Shop, Inc., et al, Case No. 07-26206, Docket No. 546 (Bankr. D.N.J. 2008); In re Harvey Elecs., Inc., Case No. 07-14051-alg, Docket No. 177 (Bankr. S.D.N.Y. 2008); In re Dawahare's of Lexington, LLC, Case No. 08-51381-jms, Docket No. 316 (Bankr. E.D. Ky 2008); In re New Weathervane Retail Corp., 04-116349-PJW, Docket No. 566 (Bankr. D. Del. 2005); In re Blades Board & Skate, LLC, Case No. 03-48818, Docket No. 126 (Bankr. D.N.J. 2004).

### ii.    Dismissal of These Cases Is Warranted Under Section 305(a)(1) of the Bankruptcy Code

70.    Alternatively, cause exists to dismiss these chapter 11 cases pursuant to section 305(a) of the Bankruptcy Code, which provides, in pertinent part:

> (a)    The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1)   the interests of creditors and the debtor would be better served by such dismissal or suspension;

11 U.S.C. § 305(a).

71.   In applying section 305(a), courts have considered a wide range of factors, including, but not limited to:

(i)   economy and efficiency of administration;

(ii)   whether federal proceedings are necessary to reach a just and equitable solution;

(iii)   whether there is an alternative means of achieving an equitable distribution of assets; and

(iv)   whether the debtor and the creditors are able to work out a less expensive out-of- court arrangement which better serves the interests in the case.

See In re Crown Village Farm, LLC, Case No. 09-11522 (KG), U.S. Bankr. LEXIS at *24 (Bankr. D. Del. June 12, 2009) (enumerating 305(a) factors and denying motion only because dismissal or abstention would have a deleterious effect on the administration of the debtor's chapter 11 case "which would languish while core issues were tried elsewhere"); see also In re Mazzocone, 200 B.R. 568, 575 (E.D. Pa. 1996).  However, "the exact factors to be considered and the weight to be given to each of them is highly sensitive to the facts of each individual case." Mazzocone, 200 B.R. at 575.

72.   Dismissal of these cases is warranted under section 305(a)(1) for the same reasons that "cause" exists to dismiss these cases pursuant to section 1112(b) -- approval of the Settlement dismissal of the cases will effectuate an efficient administration of these estates and represent the least expensive and most equitable alternative for distribution of the Debtors' assets.  Indeed, courts across the country have approved structured dismissals similar to that proposed by the instant Joint Motion under section 305(a) of the Bankruptcy Code. See, e.g., In re Scient, Inc., et al., Case No. 02-13455 (AJG), Docket No. 821 (Bankr. S.D.N.Y. 2006); In re CSI, Inc., et al., Case No. 01-12923 (REG), Docket No. 284 (Bankr. S.D.N.Y. 2006).

73. The Settlement and the Distribution and Dismissal Procedures represent the parties' negotiated resolution of these chapter 11 cases. Authorizing the distributions contemplated herein and allowing the dismissal of these chapter 11 cases furthers the efficient administration of the Debtors' estates and the maximization of value for creditors.

## NOTICE

74. Notice of this Joint Motion will be given to (a) the United States Trustee for the District of Delaware, (b) counsel to the Prepetition Lenders, (c) all creditors of the Debtors with timely filed or scheduled claims[6] and (d) parties that have requested service of papers pursuant to Bankruptcy Rule 2002. The Debtors and the Committee respectfully submit that no other or further notice is required.

## NO PRIOR REQUEST

75. No prior request for the relief sought in this Joint Motion has been made to this or any other Court.

---

6 Such parties will be served with a notice of the Motion that includes instructions on how to obtain a full copy of the Joint Motion.

**WHEREFORE**, the Debtors and the Committee respectfully request that the Court enter an order (a) approving the Settlement, (b) approving the Distribution and Dismissal Procedures, and (c) granting such other and further relief as the Court deems just and proper.

Dated: November 9, 2009
Wilmington, Delaware

YOUNG, CONAWAY STARGATT &
TAYLOR, LLP

Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

WILMER CUTLER PICKERING HALE
AND DOOR LLP
Mitchel Appelbaum (BBO #558579)
60 State Street
Boston, MA 02109

*Counsel for Debtors and
Debtors-in-Possession*

ASHBY & GEDDES, P.A.

William P. Bowden (I.D. No. 2553)
Gregory Taylor (I.D. No. 4008)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801-1246
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

-and-

COOLEY GODWARD KRONISH LLP
Jay R. Indyke (JI 0353)
Cathy Hershcopf (CH 5875)
Seth Van Aalten (SV 2663)
1114 Avenue of the Americas
New York, New York 01136
Telephone: (212) 479-6000
Facsimile: (212) 479-6275

*Counsel For The Official Committee Of
Unsecured Creditors*

**Exhibit A**
**(Settlement Stipulation)**

-----------------------------------------------------------X

In re:

KB TOYS, INC.
a Delaware corporation, et al.,

Debtors.

Chapter 11

Case No.: 08-13269 (KJC)

Jointly Administered

-----------------------------------------------------------X

## STIPULATION BY AND AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE PRENTICE ENTITIES

KB Toys, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors (the "Committee") and the Prentice Entities (defined below) stipulate and agree as follows (this "Stipulation"):[1]

A. WHEREAS, the Debtors entered into that certain Amended and Restated Credit Agreement dated as of January 31, 2007 (as amended, supplemented, restated or otherwise modified prior to the Petition Date (defined below), the "Prepetition Second Lien Credit Agreement" and, together with all other loan, guaranty, security and other documents executed in connection therewith, the "Prepetition Second Lien Credit Documents") with PKBT Lending LLC, as Agent and Collateral Agent (the "Prepetition Second Lien Agent") and the lender parties thereto from time to time (collectively and together with the Prepetition Second Lien Agent, the "Prepetition Second Lien Lenders"), pursuant to which the Prepetition Second Lien Lenders provided the Debtors with certain revolving lending commitments (the "Prepetition Second Lien Facility");

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Final Cash Collateral Order (defined below).

B.     WHEREAS, on December 11, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to manage their businesses and properties as debtors-in-possession.  No trustee or examiner has been appointed in these cases.

C.     WHEREAS, on December 17, 2008, the Committee was appointed in these cases by the Office of the United States Trustee for the District of Delaware, consisting of the following seven members: (i) Li & Fung Toy Island Manufacturing; (ii) Mattel, Inc.; (iii) Hasbro, Inc.; (iv) Simon Property Group, Inc.; (v) GGP Limited Partnership; (vi) Big Lots, Inc.; and (vii) JJ Bean, Inc.;

D.     WHEREAS, pursuant to that *Amended and Restated Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Modifying the Automatic Stay* dated January 28, 2009 (Doc. No. 334) (the "Final Cash Collateral Order"), the Debtors stipulated, among other things, subject to the Committee's right to challenge such stipulations, that the principal amount of revolving debt owed by the Debtors under the Prepetition Second Lien Facility as of the Petition Date was approximately $95,000,000 (together with any and all accrued and unpaid interest and other "Obligations" (as defined in the Prepetition Second Lien Credit Documents, the "Prepetition Second Lien Obligations") and the Prepetition Second Lien Obligations were secured by valid, perfected and enforceable liens and security interests (the "Prepetition Second Liens") in and on the Prepetition Collateral with priority over all liens and encumbrances on the Prepetition Collateral other than the Prepetition First Liens and the Permitted Prior Encumbrances;

E.     WHEREAS, pursuant to the Final Cash Collateral Order, the Debtors granted the Prepetition Second Lien Lenders adequate protection to the extent of any diminution in value of

their interests in the Prepetition Collateral (including the Cash Collateral) in the form of (i) the Junior Adequate Protection Liens, (ii) the Junior Adequate Protection Superpriority Claim and (iii) the Junior Adequate Protection Payments;

F.    WHEREAS, pursuant to the Final Cash Collateral Order, all Junior Adequate Protection Payments to the Prepetition Second Lien Lenders are being held in escrow (the "WTC Escrow Account") by Wilmington Trust Company ("the "Escrow Agent") pursuant to that Escrow Agreement dated as of January 23, 2009, by and among the Debtors, the Committee, the Prepetition Second Lien Lenders, a joint venture comprised of Gordon Brothers Retail Partners, LLC and Great American Group, LLC, and Wilmington Trust Company (the "WTC Escrow Agreement"). As of the date of this Stipulation, approximately $15.3M is being held in the WTC Escrow Account pursuant to and in accordance with the terms of the Final Cash Collateral Order and the WTC Escrow Agreement; and

G.    WHEREAS, pursuant to the Final Cash Collateral Order, as part of the adequate protection provided to the Prepetition First Lien Lenders, the Debtors received authorization to pay to the Prepetition First Lien Lenders any Excess Cash Collateral to permanently reduce the Prepetition First Lien Obligations of the Debtors under the Prepetition First Lien Facility;

H.    WHEREAS, pursuant to and in accordance with the Final Cash Collateral Order, the Prepetition First Lien Lenders have received indefeasible payment in full of all Prepetition First Lien Obligations owed by the Debtors and have been released from any and all Committee Claims (defined below);

I.    WHEREAS, pursuant to the Final Cash Collateral Order, payment in the form of an agreed surcharge pursuant to section 506(c) of the Bankruptcy Code was made for postpetition rent for the period of December 11, 2008 through December 31, 2008 ("December 2008 Stub Rent") to each landlord of a store location occupied by the Debtors for all or some

portion of February 2009 who agreed to accept payment of prorated rent for February 2009 ("Pro-Rata Rent");

J.      WHEREAS, pursuant to the Final Cash Collateral Order, a reserve (the "503(b)(9) Reserve") was established and has been maintained by the Debtors for the ultimate purpose of making creditor distributions on account of actual, allowed claims of creditors pursuant to section 503(b)(9) of the Bankruptcy Code ("Allowed 503(b)(9) Claims"). Pursuant to the Final Cash Collateral Order, the 503(b)(9) Reserve was initially funded in the amount of $1,700,000 (the minimum agreed funding amount on account of cash savings resulting from the Debtors' payment of Pro-Rata Rent for February 2009) and later further funded in the approximate amount of $450,000 (the transferred balance of the terminated Senior Indemnity Account). As of the date of this Stipulation, accordingly, approximately $2,150,000 is being held by the Debtors in the 503(b)(9) Reserve Account. An additional $50,000, currently being held by the Prepetition First Lien Lender in the Senior Indemnity Account, will be deposited into the 503(b)(9) Reserve Account in the near future.

K.      WHEREAS, pursuant to the Final Cash Collateral Order, the Committee received standing and authority to object to or challenge the Debtors' stipulations, including, but not limited to, those in relation to (i) the validity, extent, priority or perfection of the mortgage, security interests and liens of the Prepetition Second Lien Lenders, and (ii) the validity, allowability, priority, fully secured status or amount of the Prepetition Second Lien Obligations (collectively, the "Committee Claims");

L.      WHEREAS, pursuant to the Final Cash Collateral Order, the Committee was vested with the right, jointly with the Debtors, to make demand, prosecute, compromise, settle and/or otherwise deal with any Avoidance Actions, other than causes of action arising under

section 549 of the Bankruptcy Code (as to which the Debtors retained exclusive rights, until the indefeasible payment in full in cash of the Prepetition First Lien Lenders);

M.     WHEREAS, on April 30, 2009, the Committee commenced an adversary proceeding against PKBT Lending LLC, PKBT Funding LLC and Prentice Capital Management, LP (collectively, the "Prentice Entities") (Adv. Pro. No. 09-50944) (the "Committee Action") by filing a complaint seeking to, *inter alia*, recharacterize certain claims and recover certain transfers made prior to the Petition Date (the "Committee Complaint");

N.     WHEREAS, on August 26, 2009, the Committee served the Committee Complaint and a summons and notice of pretrial conference upon the Prentice Entities;

O.     WHEREAS, by agreement of the Committee and the Prentice Entities, the Prentice Entities' time to answer or otherwise respond to the Committee Complaint has been extended through and including December 22, 2009;

O.     WHEREAS, pursuant to that Order of the Court dated March 9, 2009 (Doc. No. 484) and those stipulations dated June 4, 2009 (Doc. No. 693), August 7, 2009 (Doc. No. 778) September 15, 2009 (Doc. No. 813) and October 29, 2009 [Docket No. 861] (collectively, the "Cash Collateral Extensions"), the Debtors and the Prepetition Second Lien Lenders agreed to extend the use of cash collateral through and including December 4, 2009 on the terms set forth in the Cash Collateral Extensions and accompanying Budgets.

P.     WHEREAS, on December 18, 2008, the Court entered that *Order (I) Authorizing and Approving the Conduct of Going Out of Business, Store Closing or Similar Themed Sales, With Such Sales To Be Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing the Debtors to Assume the Consulting Agreement; (III) Authorizing Customary Bonuses to Store-Level Employees of Going Out of Business Locations; and (IV) Granting Related Relief* (Doc. No. 102) (the "GOB Sale Order"). Pursuant to the GOB Sale Order, the Debtors were authorized

to, *inter alia*, assume that Consulting Agreement dated December 11, 2008 between the Debtors and a joint venture comprised of Gordon Brothers Retail Partners, LLC and Great American Group, LLC governing the conduct of store closing sales at all of the Debtors' store locations (the "GOB Sale").

Q.    WHEREAS, on September 2, 2009, the Court entered that *Order (I) Approving Asset Purchase Agreement With CE Stores, LLC, (II) Authorizing the Debtors to Sell Assets Free and Clear of Liens, Claims and Encumbrances, and (III) Granting Other Related Relief* (Doc. No. 808), pursuant to which the Debtors received authorization to sell their interests in certain intellectual property in accordance with the terms of that Purchase Agreement, dated August 6, 2009, between KB Toys, Inc. and KB Holdings, LLC and CE Stores, LLC (the "IP Sale" and collectively with the GOB Sale and all other dispositions of the Debtors' assets consummated during these chapter 11 cases, the "Asset Sales");

R.    WHEREAS, the proceeds of the Asset Sales, together with all other estate funds collected by the Debtors, are insufficient to satisfy all of the remaining Prepetition Second Lien Obligations. Specifically, the Prepetition Second Lien Lenders continue to hold an unsatisfied claim of approximately $95 million plus all accrued but unpaid prepetition interest, fees, and expenses under the Prepetition Second Lien Facility. In addition, creditor participants of the Prepetition Trade Program assert a collective claim against the Debtors secured by third priority liens on substantially all of the Debtors' assets in the approximate amount of $2,048,872, which claim (to the extent it were to be allowed) would be a prepetition general unsecured claim, in light of the substantial undersecured position of the Prepetition Second Lien Lenders.

S.    WHEREAS, the Debtors' remaining assets consist of the Avoidance Actions, the Committee Action and certain receivables and miscellaneous assets with a value substantially less than the outstanding secured claim of the Prepetition Second Lien Lenders. Pursuant to the

Final Cash Collateral Order, the Prepetition Second Lien Lenders, however, were granted a lien on and a superiority claim to substantially all of the Debtors' assets, including the proceeds of the Avoidance Actions (but excluding the Committee Action), and the parties hereto believe that any amounts recovered by the Debtors' estates on account of the Avoidance Actions would be payable solely to the Prepetition Second Lien Lenders. The Debtors have no remaining significant assets that they or the Committee can monetize in a cost-effective manner for the benefit of the estates or the Debtors' other creditors.

T.    WHEREAS, by order of the Court dated March 24, 2009, May 15, 2009 at 4:00 p.m. (Eastern time) was established as the deadline for all parties to assert, among others, (i) claims entitled to administrative priority under Section 503(b)(9) of the Bankruptcy Code and/or (ii) administrative claims (other than professional fee claims) against the Debtors arising from and after the Petition Date through and including March 31, 2009 (the "Administrative Claims Bar Date").

U.    WHEREAS, based upon the Debtors' review and analysis of the claims filed by the Administrative Claims Bar Date, the Debtors believe they have paid or otherwise settled and satisfied or will have satisfied prior to the hearing on the Settlement and Dismissal Motion (defined below), all of the valid post-petition administrative claims against the estates that the Debtors were or are permitted to pay under the Final Cash Collateral Order. The Debtors thus believe that (other than certain professional fees and the de minimis cost of miscellaneous operating expenses that will be paid in the ordinary course of business under the Final Cash Collateral Order), the only outstanding valid claims entitled to administrative expense priority are certain claims for December 2008 Stub Rent and certain 503(b)(9) Claims.

U.      WHEREAS, the Prepetition Second Lien Agent filed the following limited objections to the monthly applications for compensation and reimbursement of expenses of the Committee's retained professionals (collectively, the "Fee Objections"):

(a).    To the fourth, fifth, sixth and seventh monthly applications of Cooley Godward Kronish LLP, lead counsel to the Committee, seeking a reduction of requested fees in the aggregate amount of $106,515.00;

(b).    To the fifth monthly application of BDO Sediman LLP, financial advisor to the Committee, seeking a reduction of requested fees in the amount of $33,676.00; and

(c).    To the seventh monthly application of Ashby & Geddes, P.A., co-counsel to the Committee, seeking a reduction of requested fees in the amount of $7,029.00.

V.      WHEREAS, the Debtors, the Committee and the Prentice Entities have agreed to a comprehensive settlement and compromise agreement governing, among other things, the release of claims and the procedures for the structured dismissal of the Debtors' chapter 11 cases and the making of creditor distributions, on the terms and conditions set forth herein and in that *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors, Pursuant to Sections 105(a), 305(a), 349 and 1112(b) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, For Entry of an Order (A) Approving a Stipulation Between the Debtors, the Committee and the Prentice Entities, (B) Approving Procedures for (I) the Distribution of Certain Funds to Holders of Allowed Administrative Expense Claims and (II) the Dismissal of the Debtors' Chapter 11 Cases, and (C) Granting Certain Related Relief* (the "Settlement and Dismissal Motion") filed contemporaneously herewith;

W.     WHEREAS, the Debtors, the Committee, and the Prentice Entities believe that if their disputes are not resolved now, future proceedings would be protracted and expensive, involve complex issues of liability and/or damages, and involve substantial uncertainties and risks inherent in litigation.  The parties thus have considered the benefit to the Debtors' estates and creditors that will be received as a result of the settlement contained herein, particularly in light of the costs, uncertainties and risks of further litigation, and have concluded that the settlement contained herein is fair and equitable and in the best interests of the Debtors, their estates, their creditors, and all other parties-in-interest.

**NOW, THEREFORE**, in consideration of the mutual promises and other consideration described herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.     <u>Consideration to the Debtors' Estates</u>**

On the Effective Date (defined below), the Debtors' estates shall receive from the WTC Escrow the following consideration:

(a)     $700,000 of the cash proceeds of the Asset Sales, to be held in escrow by the Debtors for the dedicated purpose of making distributions to the holders of actual, allowed, but as yet unpaid, claims for December 2008 Stub Rent (the "December 2008 <u>Stub Rent Reserve</u>"). All distributions from the December 2008 Stub Rent Reserve shall be subject, in all respects, to the terms, conditions and procedures set forth in the order (the "<u>Approval Order</u>") approving this Stipulation and the Settlement and Dismissal Motion.

(b)     $150,000 of the cash proceeds of the Asset Sales, to be held in escrow by the Debtors and paid to the Committee's professionals, upon allowance by the Court, in respect of those fees subject to the Fee Objections (the "<u>Committee Professional Reserve</u>").

(c) The Prepetition Second Lien Agent, on behalf of and at the direction of the Prepetition Second Lien Lenders, shall waive, release and forever discharge any deficiency claim and any adequate protection claim of the Prepetition Second Lien Lenders against the Debtors' estates solely with respect to, and solely to the extent of, the cash/consideration to be retained by the Debtors' estates pursuant to this Section 1 and Section 3 below.

**Section 2.**  **Consideration to Prepetition Second Lien Lenders**

On the Effective Date, the Prentice Entities shall receive the following consideration (which shall be paid to the Prepetition Second Lien Agent for the benefit of the Prepetition Second Lien Lenders):

(a) All cash of the Debtors' that from time to time comes into the possession of the Debtors' estates (whether from proceeds of the Asset Sales, pending causes of action, release of cash collateral supporting letters of credit or otherwise) other than (i) cash held in the 503(b)(9) Reserve and (ii) cash used or to be used by the Debtors pursuant to and in accordance with Sections 1, 3 and 7 hereof.

(b) All cash then held in the WTC Escrow Account in excess of the amounts to be distributed to the Debtors in accordance with Sections 1, 3 and 7 hereof. Pursuant to the terms of the WTC Escrow Agreement, the Debtors and the Committee shall seek authorization in the Settlement and Dismissal Motion to cause the Escrow Agent to disburse the funds held in the WTC Escrow Account in a manner consistent with the terms of this Stipulation.

(c) Except as specifically set forth in this Stipulation, under no circumstances shall the Prepetition Second Lien Lenders or any Prentice Entity be liable for any funding of, or the making of any payments related to, obligations of the Debtors' estates, including, without limitation, payment of any claims of any creditors of the Debtors, none of which shall be chargeable to, or be the responsibility of, the Prepetition Second Lien Lenders or any Prentice

Entity. For the sake of clarity, and subject to the terms of the final sentence of Section 7, the Prepetition Second Lien Lenders shall be entitled to receive 100% of the proceeds held or received by the Debtors other than proceeds constituting consideration required to be distributed to the Debtors' estates as set forth in Sections 1, 3, and 7 of this Agreement. Under no circumstances shall any amounts paid to the Prepetition Second Lien Lenders or any Prentice Entity to date or in the future be subject to disgorgement or return to the Debtors or their estates or otherwise.

From and after the Effective Date, the Prepetition Second Lien Lenders may request and the Debtors shall execute such documents as are reasonably required to transfer title to uncollected accounts receivable and other non-monetary assets of the estates to the Prepetition Second Lien Lenders.

**Section 3.**     **Extension of Use of Cash Collateral and Budget Modification**

On the Effective Date:

(a)     Clause (b) of the first sentence of paragraph 3 of the Final Cash Collateral Order, as previously modified by the Cash Collateral Extensions, shall be further amended such that the date "December 4, 2009" is replaced with the date January 31, 2010.

(b)     The Budget attached to the Final Cash Collateral Order as Exhibit A shall be replaced with the Budget attached to this Stipulation as Exhibit A, which has been agreed upon by the Debtors, the Committee and the Prepetition Second Lien Lenders, and shall be deemed to be the "Budget" within the meaning of the Final Cash Collateral Order.

(c)     Except as specifically amended by the terms of this Stipulation, the Final Cash Collateral Order shall remain in full force and effect in accordance with its terms.

**Section 4.**     **Release of Committee Claims and Allowance of Secured Claim**

On the Effective Date:

(a). The Committee shall (i) waive, release and forever discharge any and all Committee Claims against the Prentice Entities, the Prepetition Collateral, and the validity or amount of the Allowed Prepetition Second Lien Lenders' Claim (defined below) and (ii) cause the Committee Action to be dismissed with prejudice. The time for the Prentice Entities to respond to the Committee Complaint shall be tolled pending the Effective Date and, in the event the Effective Date does not occur, until the date that is twenty (20) days following the date of entry of an order denying the Settlement and Dismissal Motion.

(b). The claim of the Prepetition Second Lien Agent on behalf of the Prepetition Second Lien Lenders shall be allowed in the amount of $105,566,516, (the "Allowed Prepetition Second Lien Lenders' Claim").

(c). The Prepetition Second Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and not subject to recharacterization, subordination and otherwise unavoidable. The Allowed Prepetition Second Lien Lenders' Claim shall be deemed allowed as a secured claim within the meaning of section 506 of the Bankruptcy Code. The stipulations contained in this paragraph shall be binding on all creditors, interest holders and parties in interest in the Debtors' chapter 11 cases.

**Section 5.** **Withdrawal of Fee Objections**

On the Effective Date, the Prepetition Second Lien Agent on behalf of the Prepetition Second Lien Lenders shall cause the Fee Objections to be withdrawn and shall not contest the requests of the Committee's professionals for allowance and payment of the subject fees; provided, however, such fees shall be payable solely from the Committee Professional Reserve.

**Section 6.** **503(b)(9) and Stub Rent Claims Allowance Process**

Within fifteen (15) days after the Effective Date (or such later date as may be agreed to in writing by the parties hereto), the Debtors shall, in accordance with the procedures set forth in

the Approval Order, provide notice to those parties that timely filed (or who are otherwise deemed by order of the Court to have timely filed) claims asserting administrative priority on account of December 2008 Stub Rent or under Section 503(b)(9) of the Debtors' proposed allowed amounts of such claims to share in the 503(b)(9) Reserve and the December 2008Stub Rent Reserve. Any disputes regarding the allowed amounts proposed by the Debtors shall be resolved in accordance with the procedures set forth in the Approval Order.

**Section 7.**     **Funding of Professional Fee Escrows**

Immediately prior to submission of an order dismissing the Debtors' Chapter 11 cases as provided for in the Approval Order, the Debtors shall, consistent with the Final Cash Collateral Order and Budget (as amended) and the Carveout, fund to each of the professionals retained by the Debtors and the Committee an amount equal to their respective estimated unpaid professional fees and expenses through the proposed date of dismissal (collectively, the "Professional Fees Escrows"), which funds shall be held in escrow by such professionals until payment of their fees and expenses is permitted by the terms of the Approval Order or other order of the Court. Any funds remaining in any of the Professional Fees Escrows after payment of all allowed fees of such professional shall be promptly remitted to the Prepetition Second Lien Lenders.

**Section 8.**     **Dismissal of Bankruptcy Cases**

Promptly after distribution of the funds in the 503(b)(9) Reserve and the December 2008 Stub Rent Reserve, funding of the Professional Fees Escrows, and payment of any then accrued and unpaid fees to the Office of the United States Trustee, the Debtors' Chapter 11 cases shall be dismissed, as provided for in the Approval Order.

**Section 9.**     **Waiver of Right to Avoidance Actions**

Subject to and effective upon the dismissal of the Debtors' Chapter 11 cases, the Prepetition Second Lien Lenders shall be deemed to have waived any lien upon or other right or claim to any Avoidance Actions or the proceeds thereof.

**Section 10.**     **Form of Approval Order**

The effectiveness of this Stipulation is subject to the entry of the Approval Order, in the form attached hereto as Exhibit B, or such other form of order as may be agreed to in writing by the Debtors, Committee and Prentice Entities, which order shall, among other things, approve the Stipulation, approve procedures for fixing the allowed amounts of the 503(b)(9) Claims and December 2008 Stub Rent Claims to share in the December 2008 Stub Rent Reserve and 503(b)(9) Reserve and provide for the dismissal of the Debtors' Chapter 11 cases upon the filing of the requisite certification of counsel for the Debtors.

**Section 11.**     **Exculpation**

From and after the Effective Date, none of the Debtors, nor the Committee, nor the Prentice Entities, nor any of the Debtors', Committee's or Prentice Entities' respective present or former directors, officers, employees, shareholders, partners, members, affiliated funds, attorneys, consultants, advisors and agents (in each case, acting in such capacities), shall have or incur any liability to any person for any act taken or omitted to be taken in good faith in connection with or related to the negotiation, formation, preparation, dissemination, implementation, confirmation or consummation of this Stipulation or the Approval Order (other than an act in contravention of the Stipulation or the Approval Order), or any contract, instrument, release or agreement or document created or entered into, or any other act taken or omitted to be taken in good faith in connection with the Stipulation or the Approval Order.

**Section 12.**    **Effect on Litigation**

Neither this Stipulation nor any of the terms hereof, or any negotiations or proceedings in connection herewith, shall constitute or be construed as evidence of an admission on the part of any party hereto of any liability, culpability or wrongdoing whatsoever, or of the truth or untruth of any of the claims made by any party in interest, including the claims asserted by the Committee, or the merit or any lack of merit of any of the defenses thereto; nor shall this Stipulation or any of the terms hereof, or any negotiations or proceedings in connection herewith, be offered or received in evidence or used in any proceeding against any party hereto for any purpose whatsoever, except with respect to (a) effectuation and enforcement of this Stipulation, and (b) proceedings in the Debtors' Chapter 11 Cases in furtherance of approval of this Stipulation and/or the Settlement and Dismissal Motion (including authorization and approval of this Stipulation).

**Section 13.**    **Miscellaneous**

(a)    **Reliance on Legal Counsel**

Each party hereto represents and warrants that it has not relied upon or been induced by any representation, statement or disclosure by any other party, but has relied upon its own knowledge and judgment or upon the advice and representation of its counsel in entering into this Stipulation.  Each party acknowledges that it has been represented in the negotiations for and in the execution of this Stipulation by counsel of its own choice and that it has read this Stipulation and has had it fully explained to it by its counsel and that it is fully aware of the contents of this Stipulation and its legal effect.

(b)    **No Representations or Promises Not Contained Herein**

In entering into this Stipulation each of the parties hereto represents and warrants that it relied wholly upon its own judgment, belief and knowledge.

(c)     **Due Authorization**

Each of the parties hereto represents and warrants to the other that (i) this Stipulation has been duly authorized, executed and delivered; (ii) subject to Court approval, as and to the extent required, it has the power to enter into this Stipulation; and (iii) subject to Court approval, as and to the extent required, this Stipulation shall be binding and enforceable.

(d)     **Entire Stipulation**

Except to the extent provided herein, this Stipulation and the terms of the Approval Order constitute the entire agreement of the parties with respect to the matters covered herein, and no other agreement, statement or promise regarding such matters made by any party, or by any employee, director, member, shareholder, officer, agent or attorney of any party, which is not contained in this Stipulation, shall be binding or valid. In the event of any conflict between the terms of this Stipulation and any prior order entered by this Court, the terms of this Stipulation shall control.

(e)     **Controlling Law**

This Stipulation shall be governed by, construed in accordance with, and enforced under the laws of Delaware, without regard to the rules of conflict of laws of the State of Delaware or any other jurisdiction.

(f)     **Effect of Captions**

Captions of the sections of this Stipulation are for convenience and reference only, and the words contained therein shall in no way be employed to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Stipulation.

(g)    **Severability**

If any provision of this Stipulation is held, determined or adjudged to be invalid, unenforceable or void for any reason whatsoever, this entire agreement shall be null and void unless the parties hereto agree otherwise in writing..

(h)    **Construction**

This Stipulation shall be construed as if prepared jointly by the parties hereto, and any uncertainty or ambiguity shall not be interpreted against any of the parties.

(i)    **Rights and Liabilities of Successors**

This Stipulation shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, predecessors, successors, assigns, parent and subsidiary corporations, officers, directors, members, shareholders, affiliated funds, agents, attorneys, partners, representatives and employees, as applicable.  Except as otherwise expressly provided herein, this Stipulation is not intended to confer upon any other person or entity any rights or remedies hereunder.

(j)    **Execution in Counterparts; Facsimile Signatures**

This Stipulation may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which counterparts together shall constitute one and the same instrument.  This Stipulation shall become enforceable when each party hereto shall have received counterparts thereof signed by the other parties hereto.  Facsimile or other electronically transmitted signature pages shall be deemed to be originals for all purposes.

(k)    **Not a Solicitation of Securities or Plan Acceptances**

This Stipulation does not constitute an offer of securities or a solicitation of acceptances or rejection of any proposed or contemplated chapter 11 plan of reorganization or liquidation.

(l)  **Amendment**

This Stipulation may be modified, amended or otherwise changed only in a writing signed by all of the parties hereto.

(m)  **Effective Date**

This Stipulation shall become effective and binding upon the parties upon the date the Court enters an order granting the Settlement and Dismissal Motion and approving this Stipulation (the "Effective Date").

(n)  **Consent to Jurisdiction**

All actions brought arising out of or in any way related to this Stipulation shall be brought in the Court, and the Court shall retain exclusive jurisdiction to determine any and all such actions.

AGREED TO:
AS OF THIS 9th DAY OF NOVEMBER 2009

YOUNG, CONAWAY STARGATT & TAYLOR, LLP

Joel A. Waite (No. 2925)
Matthew B. Lunn (No. 4119)
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

WILMER CUTLER PICKERING HALE AND DOOR LLP
Mitchel Appelbaum (BBO #558579)
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

*Counsel for Debtors and Debtors-in-Possession*

LANDIS RATH & COBB LLP

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

-and-

SCHULTE ROTH & ZABEL LLP
Lawrence V. Gelber
919 Third Avenue
New York, NY 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Counsel for the Prentice Entities*

ASHBY & GEDDES, P.A.

_____
William P. Bowden (I.D. No. 2553)
Gregory Taylor (I.D. No. 4008)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801-1246
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

-and-
COOLEY GODWARD KRONISH LLP
Jay R. Indyke (JI 0353)
Cathy Hershcopf (CH 5875)
Seth Van Aalten (SV 2663)
1114 Avenue of the Americas
New York, New York 01136
Telephone: (212) 479-6000
Facsimile: (212) 479-6275

*Counsel For The Official Committee Of
Unsecured Creditors*